**[Cite as *McMichael v. Akron Gen. Med. Ctr.*, 2017-Ohio-7594.]**

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS | |
| | )ss: | NINTH JUDICIAL DISTRICT | |
| COUNTY OF SUMMIT | ) | | |

ANTHONY MCMICHAEL

     Appellee

     v.

AKRON GENERAL MEDICAL CENTER,
et al.

     Appellants

C.A. No.      28333

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     CV 2013 11 5404

DECISION AND JOURNAL ENTRY

Dated: September 13, 2017

---

CALLAHAN, Judge.

{¶1} Defendant-Appellants, General Emergency Medical Specialists, Inc. ("General Emergency") and Dr. John Pakiela, appeal from the judgment of the Summit County Court of Common Pleas in favor of Plaintiff-Appellee, Anthony McMichael, acting as Administrator for the Estate of Nakeyia McMichael. This Court affirms.

I.

{¶2} On the morning of June 8, 2012, Mr. McMichael took his wife to the emergency room at Akron General because she was nauseous and experiencing a severe headache. Ms. McMichael had been diagnosed with lupus as a teenager and, since 2010, had struggled with cerebral edema (i.e., brain swelling). She had sought emergency treatment for her headaches three times between November 2010 and April 2011, had previously been hospitalized, and was under the care of a neurologist. She also had undergone numerous brain imaging studies for her condition, including a CT scan and an MRI at Akron General in December 2010. When she and

her husband arrived at Akron General, they spoke with a triage nurse and told the nurse that Ms. McMichael was being monitored for "'swelling' in [the] head." It is undisputed that the nurse included that information when completing the triage sheet in Ms. McMichael's chart.

{¶3} Dr. Pakiela, a General Emergency physician, was the attending physician in the emergency room when Ms. McMichael arrived for treatment. A resident under his supervision initially spoke with Mr. and Mrs. McMichael, obtained a history, and examined Ms. McMichael. Dr. Pakiela then spoke with the resident and adopted his planned course of treatment. Ms. McMichael was ultimately treated for a migraine headache and discharged approximately two hours after her arrival. During that time, her prior medical records were not reviewed, a neurologist was not consulted, no imaging studies were ordered, and no edema medications were administered.

{¶4} After her husband brought her home, Ms. McMichael was bedridden for the remainder of the day. There was evidence that her headache, while less severe than it had been that morning, remained and that she was drowsy and repeatedly vomited. She woke her husband the following morning with severe head pain and, shortly thereafter, became unresponsive. An ambulance brought her back to Akron General where doctors discovered that her brain had herniated due to swelling. Because Ms. McMichael could not recover from the injury her brain had sustained, her family authorized the cessation of treatment, and she died.

{¶5} Following his wife's death, Mr. McMichael filed a medical malpractice suit against General Emergency and Dr. Pakiela.[1] His complaint raised claims for survivorship and wrongful death and was subsequently amended to include a request for punitive damages. Upon

---

[1] The complaint also named several other defendants, but Mr. McMichael voluntarily dismissed his claims against those defendants before trial.

motion, the trial court agreed to bifurcate the trial and reserve evidence on the punitive damages phase until the jury decided the issue of compensatory damages. The first phase of trial lasted two weeks and, at its conclusion, the jurors were given thirteen interrogatories to complete in addition to the general verdict form.

{¶6} The jury found Dr. Pakiela negligent in his care and treatment of Ms. McMichael for the reason that he failed "to request imaging or [a] consult in regard to head 'swelling.'" The jury determined that the doctor's negligence was the proximate cause of her death and awarded compensatory damages on the wrongful death claim. The jury did not find, however, that Dr. Pakiela's negligence was the proximate cause of any pain or suffering that Ms. McMichael experienced. Accordingly, the jury did not award any damages on the survivorship claim. The jury's finding on pain and suffering also negated the claim for punitive damages.

{¶7} Following the jury's verdict, General Emergency and Dr. Pakiela filed a motion for setoff as well as a motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, a new trial. They argued that the jury's verdict was the result of sympathy, passion, or prejudice rather than the evidence and, further, that several procedural irregularities had tainted the verdict. Mr. McMichael responded in opposition to their motions, and General Emergency and Dr. Pakiela filed reply briefs. Upon review, the trial court denied the motion for JNOV and/or a new trial, granted the motion for setoff, and reduced the jury's compensatory damage award.

{¶8} General Emergency and Dr. Pakiela appealed from the trial court's judgment, and Mr. McMichael filed a notice of cross-appeal. The record reflects, however, that Mr. McMichael only filed a brief in response to the initial appeal and did not file a brief in support of his cross-appeal. As such, the cross-appeal is dismissed, and only General Emergency and Dr. Pakiela's

appeal is before this Court for review. *See* App.R. 18(C). The appeal raises two assignments of error.

II.

## ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED BY FAILING TO GRANT A [JNOV] IN FAVOR OF DR. JOHN PAKIELA AND [GENERAL EMERGENCY] ON PLAINTIFF'S WRONGFUL DEATH CLAIM.

{¶9}    In their first assignment of error, General Emergency and Dr. Pakiela argue that the trial court erred when it denied their motion for JNOV. Specifically, they argue that Mr. McMichael failed to establish that his wife's death was the proximate result of Dr. Pakiela's negligence. This Court disagrees.

{¶10}   After a court enters judgment on a jury's verdict, a party may file a motion for JNOV to have the judgment set aside on grounds other than weight of the evidence. *See* Civ.R. 50(B). "JNOV is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the non[-]moving party reasonable minds could come to but one conclusion, that being in favor of the moving party." *Williams v. Spitzer Auto World, Inc.*, 9th Dist. Lorain No. 07CA009098, 2008-Ohio-1467, ¶ 9. "If reasonable minds could reach different conclusions, the motion must be denied." *Magnum Steel & Trading, L.L.C. v. Mink*, 9th Dist. Summit Nos. 26127 & 26231, 2013-Ohio-2431, ¶ 12. "'Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon [JNOV].'" *Williams* at ¶ 9, quoting *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986). A de novo standard of review applies to a trial court's decision to grant or deny a motion for JNOV. *Williams* at ¶ 9.

{¶11}  A medical malpractice claim requires a plaintiff to "establish: (1) the standard of care, as generally shown through expert testimony; (2) the failure of defendant to meet the requisite standard of care; and (3) a direct causal connection between the medically negligent act and the injury sustained." *Smrtka v. Boote*, 9th Dist. Summit No. 28057, 2017-Ohio-1187, ¶ 22. Physicians have a duty "to employ that degree of skill, care and diligence that a physician * * * of the same medical specialty would employ in like circumstances." *Berdyck v. Shinde*, 66 Ohio St.3d 573, 579 (1993).  A breach of duty may arise either by commission or omission; that is, failing "to do some particular thing or things that such a physician * * * would have done under like or similar conditions and circumstances." *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), paragraph one of the syllabus.  A plaintiff must prove, through medical expert testimony, that his or her injury "'was, more likely than not, caused by the defendant's negligence.'" *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, ¶ 11 (9th Dist.), quoting *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St.3d 483, 485 (1996).

{¶12}  General Emergency and Dr. Pakiela argue that they are entitled to judgment because Mr. McMichael failed to prove that his wife died as a proximate result of Dr. Pakiela's care.  According to General Emergency and Dr. Pakiela, only one of Mr. McMichael's experts, Dr. Tommasina Papa-Rugino, was qualified to offer proximate causation testimony.  They argue that the actual symptoms Ms. McMichael experienced post-discharge were inconsistent with Dr. Papa-Rugino's description of the symptoms one would experience if one were to die as the result of progressive cerebral edema.  They aver that the undisputed evidence, paired with the jury's refusal to find pain and suffering, bolsters the conclusion that Ms. McMichael died suddenly and not as the result of a progressive condition that Dr. Pakiela failed to address.

{¶13} Ms. McMichael was 33 years old when she died. There is no dispute that, for many years, she suffered from lupus, an incurable autoimmune disease that causes those afflicted to experience various forms of inflammation in varying degrees. The parties stipulated to her medical records, and the records from late 2010 until the time of her death were key pieces of evidence at trial. To provide context for Dr. Papa-Rugino's testimony, this Court begins by outlining Ms. McMichael's relevant medical history, as gleaned from the medical records and the testimony offered at trial.

{¶14} On November 22, 2010, Ms. McMichael went to the emergency room at Akron General for a headache. She reported that the headache had started a few days before and that she was experiencing pain at a 10 out of 10 level. She was not, however, vomiting or suffering any changes in vision or neurological complaints. The doctors at the emergency room treated her with IV fluids as well as Benadryl, Reglan, and Zofran. A few hours later, they discharged her because she reported an improvement in her symptoms. The doctors then provided her with discharge instructions related to headaches and migraines and instructed her to seek further treatment should her symptoms worsen. Although her headache returned that same evening, Ms. McMichael did not immediately return to the emergency room. Instead, she attempted to manage the headache herself and left for a planned trip to Kentucky.

{¶15} Four days later, while in Kentucky, Ms. McMichael sought emergency treatment at St. Elizabeth Hospital. She reported that she had been suffering from a headache for several days, that it was not responding to narcotics, and that it was causing her to be nauseous. She further reported that she had been treated at Akron General a few days earlier. The doctors at St. Elizabeth requested a neurology consult and, though Ms. McMichael's neurological exam was normal, both a CT scan and an MRI were ordered. The doctors also gave Ms. McMichael a

variety of medications, including Reglan, Zofran, and Dilaudid. Ms. McMichael experienced some relief from the administered medications, but, upon review, her brain scans appeared abnormal. Accordingly, the doctors at St. Elizabeth gave her the option of either being admitted or being discharged to follow-up with a neurologist at home. Ms. McMichael chose to be discharged.

{¶16} Following her discharge from the hospital in Kentucky, Ms. McMichael scheduled an appointment with a local neurologist. Before her appointment could occur, however, she once again sought emergency treatment at Akron General for a headache registering a 10 out of 10 pain level and vomiting. Ms. McMichael was admitted and remained at Akron General for four days, from December 5, 2010, until December 9, 2010. The initial medications she was provided, including Benadryl, Reglan, and Zofran, afforded her no relief, so the doctors continued to observe her condition, sought the results of her scans from St. Elizabeth Hospital, and ordered a neurology consult. Ms. McMichael ultimately received a neurology consult, a neurosurgery consult, a CT scan, and an MRI at Akron General. Both brain scans were abnormal and indicative of cerebral edema (i.e., swelling of the brain), so, on December 8th, the doctors gave her Mannitol, a medication that treats edema by extracting water from cells. Ms. McMichael finally experienced relief following the Mannitol treatment and was discharged the next day to follow-up with her neurologist.

{¶17} Ms. McMichael met with Dr. Roderick Spears for the first time on December 15, 2010. At the time, Dr. Spears was a neurologist with the Cleveland Clinic, and Ms. McMichael remained a patient of his until May 2011. Dr. Spears diagnosed Ms. McMichael with cerebral edema. He explained that cerebral edema results in increased intracranial pressure that can cause headaches, nausea, vomiting, and light or sound sensitivity. He testified that he placed Ms.

McMichael on medication for her edema, but also stressed to her that she ought to seek emergency treatment if she ever experienced a 10 out of 10 headache with nausea, vomiting, or an inability to function. Dr. Spears described cerebral edema as a serious condition that could cause brain herniation and death if left untreated.

{¶18} Ms. McMichael saw Dr. Spears again for a follow-up visit on January 27, 2011, at which time she was headache free. Though her headaches had abated, Ms. McMichael was experiencing side effects from her edema medication, so they decided to try decreasing her dosage. Less than two weeks later, however, she called Dr. Spears to notify him that her headache symptoms had returned and, as a result, she was increasing her dosage. She also called the next day to report that she was experiencing severe headaches with no relief. Dr. Spears then prescribed an additional medication for her, and two full months elapsed without incident.

{¶19} Ms. McMichael received another MRI at the end of March 2011. The MRI depicted extensive cerebral edema and sagging of the brain stem and prompted another office visit to the Cleveland Clinic. Because Dr. Spears was unavailable, another neurologist saw Ms. McMichael and ordered an increase in her edema medication. Ms. McMichael then began experiencing headaches on a daily basis and called Dr. Spears twice in April 2011 to report the change in her symptoms. Although Dr. Spears once again adjusted her medications, Ms. McMichael's symptoms ultimately caused her to seek emergency treatment.

{¶20} On April 26, 2011, Ms. McMichael went to the emergency room at the Cleveland Clinic for a headache registering a 10 out of 10 pain level and several bouts of vomiting. The doctors at the Cleveland Clinic admitted her, administered pain medications, and ordered a neurology consult. Although Ms. McMichael experienced a few decreases in her pain level throughout the day and her neurological exam was normal, her headache persisted. Per the

neurologist's instructions, an MRI was ordered, and Ms. McMichael received a dose of Solu-Medrol, a strong anti-inflammatory used to treat brain swelling. Ms. McMichael then began to show signs of improvement, and the neurology department continued to monitor her. The following day, she reported that she was pain free and was discharged.

{¶21} Following her April 27, 2011 discharge, Ms. McMichael began seeing Dr. Cynthia Bamford, the Cleveland Clinic neurologist who treated her during her last emergency room visit. While under Dr. Bamford's care, Ms. McMichael underwent additional MRI scans, the first of which showed a slight improvement in her edema. She spoke with Dr. Bamford a few times during the remainder of the year and, though she reported intermittent headaches, she avoided any further trips to the emergency room. She did not seek emergency treatment again until June 8, 2012, the day before she died.

{¶22} At 5:38 a.m. on June 8, 2012, Ms. McMichael's husband brought her to the emergency room at Akron General where she presented with a headache registering a 10 out of 10 pain level. Ms. McMichael and her husband informed the triage nurse that the headache had onset suddenly, waking her from sleep. They further reported to the nurse that Ms. McMichael had a history of lupus and was being monitored for "'swelling' in [her] head." Dr. Pakiela was the attending physician on shift when Ms. McMichael and her husband came to the emergency room. A first-year resident, Dr. Scott Blanchard, was working under his supervision that day and initially examined Ms. McMichael.

{¶23} It is undisputed that, while at the emergency room, Ms. McMichael was in significant pain, had one bout of vomiting, and was experiencing light sensitivity. Her medical records from that day evidence that she saw the triage nurse at 5:47 a.m. and, thirteen minutes later, Dr. Blanchard prescribed her a migraine cocktail, consisting of Zofran, Toradol, and

Reglan. At some point during those thirteen minutes, Dr. Blanchard conducted his entire evaluation and examination of Ms. McMichael, which consisted of a physical exam and an oral patient history. He then presented the case to Dr. Pakiela, as the attending physician. Dr. Pakiela briefly met with the McMichaels before approving the orders for the migraine cocktail. The migraine cocktail was administered at 6:26 a.m. and, when it afforded no relief, Ms. McMichael was given a narcotic at 6:40 a.m. There is no dispute that a shift change occurred at 7:00 a.m., at which point Dr. Blanchard transferred Ms. McMichael's care to another resident.

{¶24} It is undisputed that Mr. McMichael left the hospital at approximately 7:15 a.m. to return home and make additional child care arrangements. Shortly thereafter, the second resident who had inherited Ms. McMichael as a patient entered her room and found her sleeping. He reported that he awakened Ms. McMichael for a reassessment and found that she "was feeling significantly better" with only a "very mild" headache. Because Ms. McMichael was feeling better and was comfortable being discharged, the second resident discharged her at 7:34 a.m. Ms. McMichael then sent a text message to her husband, asking him to pick her up at the hospital.

{¶25} The resident who discharged Ms. McMichael testified that he understood her to be suffering from chronic headaches. It was his understanding that she was experiencing one of her typical headaches and had come to the emergency room for pain relief. While he spoke with Ms. McMichael, he conceded that he did not examine her or attempt to diagnose her. He further conceded that he signed her discharge papers within five to ten minutes of meeting her. He testified that he was never told she was suffering from cerebral edema, was under a neurologist's care, or had been hospitalized previously for brain swelling. According to the resident, he discharged Ms. McMichael based on Dr. Pakiela's plan for her care, as relayed to him by Dr.

Blanchard. The plan consisted of reassessing Ms. McMichael to see if she was responding to the pain medications and discharging her if she showed signs of improvement and was comfortable with that course of action. When discharging Ms. McMichael, the resident provided her with discharge instructions for a migraine and instructed her to return if her symptoms worsened.

{¶26} Ms. McMichael's medical records from Akron General indicate that she was diagnosed with a migraine. The notes in her chart, as dictated by the two residents who treated her, describe her as having a "known history of migraines" and lupus, but do not mention cerebral edema. Dr. Blanchard, the first resident who treated Ms. McMichael, conceded that he did not attempt to review any of her prior medical records when treating her. He testified that he did not do so because he felt that the oral history he obtained during his examination was adequate. He acknowledged, however, that most of the answers he received came from Mr. McMichael because Ms. McMichael was in too much pain to respond. While Dr. Blanchard claimed that he was aware of Ms. McMichael's history of cerebral edema when he treated her and that cerebral edema was part of his differential diagnosis, he did not document any of that information in her chart.

{¶27} Dr. Blanchard did not request a neurological consult or imaging studies for Ms. McMichael. He testified that he felt both were unnecessary because Ms. McMichael had come to the emergency room for pain control and, other than the fact that she was in pain, the results of her physical examination were unremarkable. Dr. Blanchard acknowledged, however, that Ms. McMichael described her pain as being worse than usual. He also acknowledged that he could not complete a portion of the neurological examination due to her light sensitivity. According to Dr. Blanchard, he and Dr. Pakiela agreed that Ms. McMichael would be treated with pain medications, reassessed, and discharged if she had improved and felt comfortable going home.

As noted, however, neither doctor was present when the time came to reassess her. A different resident reassessed her and discharged her pursuant to Dr. Pakiela's plan. That resident testified that he was not made aware of her prior history of cerebral edema.

{¶28} Mr. McMichael specifically testified that neither he, nor his wife ever told the doctors that Ms. McMichael came to the emergency room strictly for pain control. According to Mr. McMichael, he told the medical staff that his wife had experienced brain swelling, but no one suggested that brain swelling was the current cause of her symptoms. He stated that Dr. Blanchard was the only one to examine his wife and that the examination lasted eight to nine minutes. Meanwhile, Ms. McMichael was in significant pain and started drifting off after being administered a narcotic. Mr. McMichael confirmed that neither he, nor his wife attempted to tell the doctors what type of medications she had received in the past. Rather, he believed the doctors would review her prior medical records.

{¶29} Mr. McMichael described being taken aback when his wife notified him that she was being discharged only twenty minutes or so after he had left the hospital. He explained that he had expected his wife to be kept at the hospital for a longer period of time or else he would not have left her there alone. When he arrived back at the hospital, Mr. McMichael saw his wife was sitting alone on a bench, clutching her discharge papers. He observed that she was slouched over and appeared to be "dozing off." He then roused her, helped her to the car, and drove her home. Once there, he helped her to bed, where she remained for the rest of the day. Although Mr. McMichael tried to give his wife food, water, and medicine that evening, he testified that she repeatedly vomited and was "really sleepy." He stated that he did not take his wife back to the hospital because her symptoms were consistent with the symptoms she had been having at the

hospital, he knew the doctors had discharged her with those symptoms, and he assumed the medication they gave her might need more time to be effective.

{¶30}  Mr. McMichael testified that he went to sleep that evening and, the following morning, his wife woke him because she had a "really bad" headache.  Shortly thereafter, she became unresponsive, and he called for an ambulance.  Ms. McMichael was taken back to Akron General in respiratory failure and measures were taken to secure her airway.  A CT scan was performed and revealed cerebral edema, as well as herniation.  Because Ms. McMichael had suffered brain death and stood no chance of recovery, her family authorized the cessation of treatment.  Her cause of death was listed as "tonsillar herniation of [the] cerebellum" due to "diffuse cerebral edema."

{¶31}  Dr. Papa-Rugino, a board certified neurologist with a subspecialty board in headache medicine, testified as a neurology expert on behalf of Mr. McMichael.  Dr. Papa-Rugino testified that there are two types of headaches: primary headaches and secondary headaches.  Primary headaches, such as migraines and tension headaches, cause pain, but are not life-threatening.  Meanwhile, secondary headaches are symptoms of an underlying condition such as a neurological disorder, an infection, a tumor, or a trauma.  While both types of headaches can respond to pain medication in the short term, Dr. Papa-Rugino stated that being able to differentiate between the two is of critical importance because the condition underlying a secondary headache may be deadly if left untreated.  She classified a headache resulting from cerebral edema as a secondary, "dangerous headache."

{¶32}  Dr. Papa-Rugino explained that cerebral edema causes swelling in the brain due to the presence of increased fluid.  Because the skull is a fixed, rigid structure, a person's brain only has a limited amount of room in which to swell before it "presses against blood vessels, it

presses against nerves, [and] it presses against vital structures * * *." Dr. Papa-Rugino testified that, as the brain gets closer to exceeding the maximum amount of room in the skull, even "small change[s] in pressure can lead to significant changes within the brain." If the swelling is allowed to continue, the brain eventually shifts down through the hole at the base of the skull. Dr. Papa-Rugino confirmed that, when the brain herniates in that manner, it "causes life-threatening changes and death."

{¶33} Dr. Papa-Rugino testified that certain medical conditions such as lupus can cause chronic cerebral edema. She testified that, much like other chronic conditions, chronic cerebral edema has a "waning and spiking process" where an individual may function relatively well during a waning period, but require intervention when they have flare ups. For patients with chronic cerebral edema, she stated that an acute exacerbation of their condition is "extremely dangerous" due to the chronic swelling that is already present. She testified that it is important for doctors to intervene as quickly as possible and treat the swelling while the patient is still responsive and fully functional. She explained that the three types of medications doctors use to treat cerebral edema are Mannitol, Solu-Medrol, and hypertonic saline. All three medications act by either decreasing the inflammation or the amount of fluid in the brain.

{¶34} In forming her expert opinion, Dr. Papa-Rugino testified that she reviewed Ms. McMichael's medical records from June 8, 2012, as well as her prior medical records. She testified that Ms. McMichael's older records showed that she suffered from chronic cerebral edema and that she had previously experienced acute exacerbation spikes in December 2010 and April 2011. She further testified that Ms. McMichael displayed several red flags associated with acute exacerbation on June 8th, including that she had a history of cerebral edema, had been awoken from sleep by a headache, had a headache that was worse than usual, was nauseous,

vomited at the hospital, and was drowsy. Dr. Papa-Rugino opined that, had a neurology consult been ordered on June 8th, the neurologist would have ordered brain scans and "[a]bsolutely" would have administered either Mannitol, Solu-Medrol, or hypertonic saline based on Ms. McMichael's history and symptoms. She opined within a reasonable degree of medical certainty that Ms. McMichael would have survived if she had received the foregoing treatment. According to Dr. Papa-Rugino, there was no evidence that anything other than brain herniation caused by an untreated, acute exacerbation of her chronic cerebral edema led to Ms. McMichael's death.

{¶35} As noted, General Emergency and Dr. Pakiela argue that they were entitled to a JNOV on the issue of proximate cause because the actual symptoms Ms. McMichael experienced post-discharge were inconsistent with Dr. Papa-Rugino's description of the symptoms one would experience if one were to die as the result of progressive cerebral edema. They note that Ms. McMichael experienced a significant decrease in her pain level after being treated with narcotics and did not inform her husband until the following morning that she was having severe head pain. They also note that Ms. McMichael was able to sleep through the night and had no changes in her mental status until she became unresponsive. They argue that, had she died of progressive, untreated edema, she would have experienced painful, progressively worsening symptoms.

{¶36} Upon review, this Court cannot conclude that General Emergency and Dr. Pakiela were entitled to a JNOV on the issue of proximate cause. Mr. McMichael produced evidence that his wife suffered from chronic cerebral edema and, prior to June 8th, had been repeatedly hospitalized and treated for the same. There was evidence that she was suffering from severe headache pain on the morning of June 8th, that her headache was worse than usual, that it had

awoken her from sleep, that she had light sensitivity, and that she was vomiting. Although Ms. McMichael experienced some degree of pain relief after being given narcotics, Dr. Papa-Rugino confirmed that even secondary headaches may respond temporarily to pain medications. She also noted that Ms. McMichael was not monitored for a sufficient length of time to know whether her severe pain would return. Mr. McMichael specifically testified that his wife still had a headache for the remainder of the day, that she was drowsy, and that she was unable to keep down any food, water, or medicine because she was vomiting. Moreover, he never testified that his wife slept through the night. His testimony was that he fell asleep and his wife woke him the next morning with severe head pain. Shortly thereafter, she became unresponsive.

{¶37} In ruling on a motion for JNOV, a court must view the evidence in a light most favorable to the non-moving party, and neither the weight of the evidence, nor the credibility of the witnesses, may factor into its determination. *Williams*, 2008-Ohio-1467, at ¶ 9. Akron General ultimately attributed Ms. McMichael's cause of death to "tonsillar herniation of [the] cerebellum" due to "diffuse cerebral edema." Further, Dr. Papa-Rugino testified, within a reasonable degree of medical certainty, that (1) Ms. McMichael died as the result of an untreated, acute exacerbation of her chronic cerebral edema; (2) medications used to treat cerebral edema would have saved her life; and (3) a neurology consult, if requested, would have resulted in Ms. McMichael being administered the cerebral edema medications. It was not the jury's finding that Ms. McMichael did not experience any pain and suffering before she died; only that Dr. Pakiela was not the cause of her pain and suffering. The jury could have believed that, even with the proper treatment, Ms. McMichael still would have experienced pain and suffering as a result of her underlying condition. Because reasonable minds could conclude that Ms. McMichael died as a proximate result of Dr. Pakiela's negligence, the trial court did not err when it denied the

motion for JNOV. *See Magnum Steel & Trading, L.L.C.*, 2013-Ohio-2431, at ¶ 12. Thus, General Emergency and Dr. Pakiela's first assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED BY FAILING TO GRANT A NEW TRIAL ON PLAINTIFF'S WRONGFUL DEATH CLAIM.

{¶38} In their second assignment of error, General Emergency and Dr. Pakiela argue that the trial court erred when it denied their motion for a new trial. They argue that they were denied a fair trial because: (1) the court allowed Mr. McMichael to present cumulative, incompetent expert testimony while denying them the opportunity to present certain rebuttal testimony; (2) the jury instructions were flawed in several respects; and (3) Mr. McMichael's counsel made a number of improper and highly prejudicial remarks in closing argument. They also argue that the cumulative effect of these errors deprived them of a fair trial. For the reasons that follow, this Court rejects their second assignment of error.

{¶39} Civ.R. 59(A) permits a party to seek a new trial on certain enumerated grounds or "for good cause shown." Relevant to this appeal, those enumerated grounds include:

(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;

(2) Misconduct of the jury or prevailing party;

* * *

(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

* * *

(6) The judgment is not sustained by the weight of the evidence * * *;

(7) The judgment is contrary to law; [or]

* * *

(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

Civ.R. 59(A). "'Depending upon the basis of the motion for a new trial, this Court will review a trial court's decision to grant or deny the motion under either a de novo or an abuse of discretion standard of review.'" *Jackovic v. Webb*, 9th Dist. Summit No. 26555, 2013-Ohio-2520, ¶ 17, quoting *Calame v. Treece*, 9th Dist. Wayne No. 07CA0073, 2008-Ohio-4997, ¶ 13.

**Cumulative and Incompetent Expert Testimony**

{¶40} First, General Emergency and Dr. Pakiela argue that they are entitled to a new trial because the lower court erred in the admission and exclusion of certain expert testimony. They argue that Dr. Eric Gershwin (rheumatology) and Dr. Papa-Rugino (neurology) were not qualified to offer opinions as to whether Dr. Pakiela, an emergency physician, met the standard of care applicable to doctors practicing in his specialty. They also argue that Dr. Gershwin, Dr. Michael MacQuarrie (emergency medicine), and Dr. Jerome Barakos (radiology) were not qualified to offer proximate causation testimony. According to Emergency General and Dr. Pakiela, they were prejudiced by the admission of the foregoing cumulative, incompetent expert testimony. They also argue that they were denied the opportunity to lessen that prejudice because the trial court excluded an admission from Ms. McMichael's former neurologist, Dr. Spears. That admission was that Dr. Spears could not say, within a reasonable degree of medical probability, whether Ms. McMichael's death could have been avoided if brain imaging studies had been ordered on June 8, 2012.

{¶41} In moving for a new trial on the foregoing grounds, General Emergency and Dr. Pakiela cited Civ.R. 59(A)(1), (7), and (9). An abuse of discretion standard of review applies when this Court reviews a trial court's decision to deny a new trial under Civ.R. 59(A)(1). *See, e.g., Simon v. Simon*, 9th Dist. Summit No. 26767, 2014-Ohio-1390, ¶ 21-23; *Kallergis v.*

*Quality Mold, Inc.*, 9th Dist. Summit Nos. 23651 & 23736, 2007-Ohio-6047, ¶ 10. Likewise, the admission or exclusion of expert testimony "is within the discretion of the trial court[, and] [s]uch decisions will not be disturbed absent abuse of discretion." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9. An abuse of discretion implies that a trial court was unreasonable, arbitrary or unconscionable in its judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶42} An expert tendered "'to establish the recognized standards of the medical community * * * must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place * * *.'" *Eschen v. Suico*, 9th Dist. Lorain No. 07CA009304, 2008-Ohio-4294, ¶ 18, quoting *Bruni*, 46 Ohio St.2d at 131-132. Generally, if a physician practices in a board-certified specialty, the applicable standard of care "should be that of a reasonable specialist practicing medicine or surgery in that same specialty in the light of present day scientific knowledge in that specialty field * * *." *Bruni* at paragraph two of the syllabus. Yet, an exception to the general rule exists when "fields of medicine overlap." *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 158 (1978). "Where * * * fields of medicine overlap and more than one type of specialist may perform [a] treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant." *Id.*

Dr. Gershwin

{¶43} Dr. Gershwin, who was board certified in internal medicine, rheumatology, and allergy and immunology, testified regarding lupus and the complications that can arise from that disease. Dr. Gershwin began studying lupus in 1978 and stated that, over the course of his career, he had seen hundreds of lupus patients. He verified that the subject of lupus is taught in

medical schools and that the manner in which the disease waxes and wanes is a matter of common knowledge in the medical profession. He testified that, when lupus results in brain swelling, treatment consists of involving a neurologist and administering certain drugs that target the swelling.

{¶44} Dr. Gershwin reviewed Ms. McMichael's medical records in forming his expert opinion. He testified to a reasonable degree of medical certainty that her prior scans showed that she was suffering from cerebral edema as a result of her lupus. He also testified that, on June 8, 2012, she was exhibiting the "hallmark signs of * * * a patient who's dramatically at risk." According to Dr. Gershwin, there was no indication in Ms. McMichael's records from June 8th that the doctors at Akron General had paid attention to her history of cerebral edema. He testified that her symptoms warranted a neurological consult and additional imaging studies and that, had those things been ordered, Ms. McMichael would have survived. Dr. Gershwin noted that Ms. McMichael had previously experienced similar symptoms, as documented in her records, and had survived prior spikes in her cerebral edema after being seen by neurologists and treated with either Mannitol or Solu-Medrol. He opined that Dr. Pakiela's conduct on June 8th ultimately led to her brain herniation.

{¶45} On cross-examination, Dr. Gershwin acknowledged that he was not a specialist in emergency medicine and was not testifying to the standard of care for emergency medicine specialists. Rather, he stated that he was "testifying [to] the standard of care for any physician." He clarified that any physician has the ability to read medical records and to review prior hospitalizations and treatments. There was no indication, however, that Dr. Pakiela or his resident acted on the information contained in Ms. McMichael's medical records. Therefore, it was Dr. Gershwin's opinion that Ms. McMichael "died for lack of care."

{¶46} General Emergency and Dr. Pakiela argue that Dr. Gershwin's testimony was improper because he was not qualified (1) to testify on the standard of care for an emergency medicine specialist, or (2) to offer an expert opinion on the appropriate diagnosis and treatment for cerebral edema, given that he was not a neurologist. Yet, Dr. Gershwin specifically stated that he was not testifying as to the standard of care for an emergency medicine specialist. His testimony was that Dr. Pakiela breached the standard of care applicable to *any* qualified physician because there was no evidence that he or his resident reviewed Ms. McMichael's medical records or acted on her patient history. As a seasoned physician with multiple board certifications, Dr. Gershwin had a wealth of experience with treating patients and reviewing their records in conjunction with those treatments. The trial court, therefore, could have determined within its sound discretion that he was competent to offer an opinion on the standard of care applicable to any physician. *See Alexander*, 56 Ohio St.2d at 158. *Accord Ishler v. Miller*, 56 Ohio St.2d 447, 453-454 (1978).

{¶47} This Court likewise cannot conclude that the trial court abused its discretion when it admitted Dr. Gershwin's testimony on the issue of proximate cause. Dr. Gershwin had treated hundreds of lupus patients over the course of his career and was entirely familiar with the symptoms of that disease and the complications that afflict lupus patients. While he admitted that he would defer to a neurologist on the question of the appropriate treatment for a lupus patient with brain swelling, the point of his testimony was that Dr. Pakiela failed to even consult with a neurologist. He stated that all physicians are trained to read medical records, to recognize lupus, and to identify the conditions that warrant a neurology consult. He testified that Ms. McMichael's medical records clearly showed that she had suffered previous spikes in her cerebral edema that required hospitalizations, consults with specialists, and certain treatments.

He further testified that her records showed that she died as the result of brain herniation due to untreated cerebral edema. Based on his extensive experience treating lupus patients, it was not unreasonable for the trial court to find him competent to testify that Dr. Pakiela's failure to seek a neurology consult for Ms. McMichael led to her death. Accordingly, this Court rejects General Emergency and Dr. Pakiela's argument insofar as it pertains to Dr. Gershwin.

Dr. Papa-Rugino

{¶48} This Court outlined much of Dr. Papa-Rugino's testimony in its discussion of the first assignment of error. Dr. Papa-Rugino, a board-certified neurologist with a subspecialty board in headache medicine, testified on the issue of proximate cause, but also offered standard of care testimony over the objection of the defense. She testified that the fields of neurology and emergency medicine routinely interact because hospitals see a significant number of headache patients in need of neurology consults or referrals. In addition to interacting with emergency room physicians on a daily basis through her practice, Dr. Papa-Rugino testified that she was part of several committees, including a clinical excellence committee, a clinical medical executive committee, and a quality outcomes committee. She testified that emergency room physicians were also involved in the foregoing committees and that her committee work included being responsible for establishing departmental protocols and monitoring procedures at eleven hospitals in her state. According to Dr. Papa-Rugino, her committee work had given her insight into the "minimum competence * * * of all the physicians involved in these protocols, particularly the ER physicians." Dr. Papa-Rugino testified that, as a result of her committee work and her "day-to-day interaction with ER physicians, [she was] capable of determining what is even the basic competence of ER physicians * * * in the treatment not just of neurological disorders but neurological emergencies for [] patients." She opined that Dr. Pakiela breached the

applicable standard of care by not obtaining Ms. McMichael's medical records and by ignoring her medical history.

**{¶49}** General Emergency and Dr. Pakiela do not dispute that Dr. Papa-Rugino was competent to testify on the issue of proximate cause. Their argument only concerns her testimony on the standard of care. Specifically, they contend that her standard of care testimony was improperly admitted because she was not an emergency medicine specialist and had never practiced in that field.

**{¶50}** General Emergency and Dr. Pakiela fail to address Dr. Papa-Rugino's testimony that she was familiar with the standard of care applicable to emergency medicine specialists due to her daily interaction with emergency physicians and her committee work. Even assuming that the trial court abused its discretion in admitting her standard of care testimony, however, the record reflects that the error was harmless. *See Buckingham, Doolittle, Burroughs, L.L.P. v. Izaldine*, 9th Dist. Summit No. 27956, 2016-Ohio-2817, ¶ 11. Mr. McMichael otherwise presented expert testimony on the standard of care. As discussed below, he presented the testimony of Dr. MacQuarrie, an expert in emergency medicine. He also presented the testimony of Dr. Gershwin, whose testimony this Court has already deemed admissible. Because General Emergency and Dr. Pakiela have not shown that the admission of Dr. Papa-Rugino's standard of care opinion affected their substantial rights, this Court rejects their argument. *See* Civ.R. 61.

Dr. MacQuarrie

**{¶51}** Dr. MacQuarrie testified as a board-certified expert in emergency medicine. He outlined the role of an emergency physician and identified the numerous ways in which Dr. Pakiela failed to meet the applicable standard of care. Specifically, he testified that Dr. Pakiela breached the standard of care by failing to obtain an adequate medical history from Ms.

McMichael, to review her medical records, and to order a neurology consult and brain imaging. He also agreed that the standard of care requires emergency room doctors to rule out brain swelling, a life-threatening condition, as the cause of a patient's headache symptoms before discharging the patient.

{¶52} Apart from his extensive testimony on the standard of care, Dr. MacQuarrie also responded to a single question about proximate cause. When asked if he had come to a conclusion, within a reasonable degree of medical certainty, whether Ms. McMichael would have survived if Dr. Pakiela had met the standard of care, Dr. MacQuarrie replied "I think she would have." General Emergency and Dr. Pakiela take issue with the doctor's solitary statement, arguing that he was not qualified to testify on proximate cause. Their brief, however, does not expound on that point, and this Court will not construct an argument on their behalf. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). Moreover, Dr. Papa-Rugino gave detailed testimony on the issue of proximate cause, and General Emergency and Dr. Pakiela do not take issue with that testimony. As such, any error in the admission of Dr. MacQuarrie's single statement was harmless. *See* Civ.R. 61.

Dr. Barakos

{¶53} Dr. Barakos, a board-certified radiologist with subspecialty training in neuroradiology, testified regarding all of the brain imaging studies that Ms. McMichael received from November 2010 until the day of her death. He testified that her scans showed a history of cerebral edema, with fluctuations in severity. He specified that there were severe periods of edema in November and December 2010, a slight improvement in the edema in March 2011, and a severe instance of edema in April 2011 that included signs of early herniation. He further specified that her scans from June 2011 and September 2011 once again looked more favorable,

but her final scan on the day of her death was indicative of extensive swelling and herniation. Dr. Barakos opined to a reasonable degree of medical certainty that Ms. McMichael died as the result of herniation from brain swelling.

{¶54} During a portion of his direct examination, Dr. Barakos was asked about Mannitol, a medication that treats edema by extracting water from cells. Dr. Barakos confirmed that he had seen imaging scans from cerebral edema patients who had been treated with Mannitol, including Ms. McMichael. The following exchange then occurred:

> [PLAINTIFF'S COUNSEL]: So based upon that experience, Doctor, what does [Ms. McMichael's previous] relief from pain from mannitol indicate to you in terms of a diagnosis?
>
> [DEFENSE COUNSEL]: Objection.
>
> [THE COURT]: Based on the images he has seen?
>
> [PLAINTIFF'S COUNSEL]: That's based on the images, yes.
>
> * * *
>
> [DR. BARAKOS]: So, yes, that's confirmatory. We * * * have imaging that proves that she has got brain swelling; you give a medication that is specifically designed to reduce brain swelling. The brain swelling causes the headache. So that's what we refer to as a diagnostic test or tool: Give mannitol, patient gets better, and it confirms that it's treating what we see here, which is the global brain swelling.

According to General Emergency and Dr. Pakiela, the foregoing exchange amounted to opinion testimony that, had Ms. McMichael received Mannitol on June 8, 2012, she would have survived.

{¶55} The record does not support General Emergency and Dr. Pakiela's assertion that Dr. Barakos offered inadmissible testimony on proximate cause. It was not Dr. Barakos' testimony that Ms. McMichael would have lived if she had received Mannitol. Rather, it was his testimony that Mannitol could be used as a diagnostic tool to confirm brain swelling. Because

Dr. Barakos did not offer an opinion on whether Dr. Pakiela proximately caused Ms. McMichael's death, this Court rejects General Emergency and Dr. Pakiela's argument.

Dr. Spears

{¶56} As noted, Dr. Spears was Ms. McMichael's treating neurologist from December 2010 until May 2011. He testified in detail about her condition and his instructions to her to seek emergency medical treatment if he was unavailable and she was experiencing a 10 out of 10 pain level headache with nausea or vomiting and an inability to function. He explained that Ms. McMichael was a herniation risk if her swelling increased and she did not receive treatment for it, so he instructed her to go to the emergency room where she could be evaluated for treatments, consultations, or additional imaging studies. He outlined her previous hospitalizations and the treatments she had received on those visits. He also testified that the symptoms she reported experiencing on June 8, 2012, sounded similar to the symptoms she had experienced in April 2011 when she had gone to the Cleveland Clinic's emergency room. Dr. Spears confirmed that, on June 8th, Ms. McMichael was discharged without receiving a neurology consult, without her prior medical records being obtained, without additional imaging studies being performed, and without any edema medications being administered.

{¶57} Dr. Spears' testimony was recorded in advance of trial and played for the jury in lieu of having the doctor appear in court. Before the recording was shown to the jury, the court struck a specific portion of his testimony, during which defense counsel asked Dr. Spears for an admission. Specifically, defense counsel asked the doctor to confirm that he was not testifying to a reasonable degree of medical certainty that Ms. McMichael's death could have been avoided. Mr. McMichael's counsel objected to the question, and the trial court ultimately

sustained the objection and excluded that portion of the recorded testimony when it was played for the jury.

{¶58} General Emergency and Dr. Pakiela argue that the trial court's ruling prejudiced them because the trial was littered with "incompetent expert testimony," Dr. Spears was an important witness, and, without the "important admission" he made, his testimony created the impression that Dr. Pakiela's conduct caused Ms. McMichael's death. Upon review, their arguments lack merit.

{¶59} First, General Emergency and Dr. Pakiela have not shown that the trial court repeatedly erred by admitting "incompetent expert testimony." The trial court acted within its discretion in admitting the testimony of Dr. Gershwin and Dr. Barakos. As to Dr. MacQuarrie, General Emergency and Dr. Pakiela have failed to explain why the lower court erred in its admission of his single statement, so this Court has not reached any conclusion on that issue. Dr. Papa-Rugino was the only expert who gave certain testimony of questionable admissibility (i.e., her testimony on the standard of care), but the admission of that testimony was harmless at best. Thus, the record simply does not support General Emergency and Dr. Pakiela's assertion that the trial court made "multiple errors in admitting incompetent expert testimony * * *."

{¶60} Second, the record does not support General Emergency and Dr. Pakiela's representation that Dr. Spears made an "important admission" when asked whether he was offering an opinion on proximate causation. The portion of his testimony that the court excluded reads as follows:

> [DEFENSE COUNSEL]: And Dr. Spears, just so I understand, you are not giving an opinion here to a reasonable degree of medical probability that [Ms.] McMichael's death could have been avoided, correct?
>
> * * *

[DR. SPEARS]: I think imaging could have made a difference in the case. I don't know for sure if it would have or not. So what is it, 51 percent? I don't -- I don't think I would have been comfortable as her treating physician with a discharge call from an emergency room physician without imaging having been done. So I would need the imaging studies showing chronic change on the record before I would agree with that statement.

Thus, Dr. Spears did not definitively make any admission. In fact, he expressed his concern that Ms. McMichael was discharged without brain imaging studies having been performed.

{¶61} Neither party called Dr. Spears as an expert witness. Rather, Mr. McMichael called him as his wife's treating neurologist. Dr. Spears, therefore, was not meant to testify on the standard of care or proximate cause. The record reflects that the trial court acted within its discretion when it excluded the foregoing exchange, as it was intended to elicit from Dr. Spears testimony related to proximate causation. General Emergency and Dr. Pakiela's argument to the contrary lacks merit.

**Flawed Jury Instructions**

{¶62} General Emergency and Dr. Pakiela next argue that they are entitled to a new trial because the jury instructions were flawed. First, they argue that the trial court erred when it refused to give a hindsight instruction. Second, they argue that it erred in its instruction on life expectancy. Third, they argue that it erred when it read an insurance instruction on two separate occasions.

{¶63} In moving for a new trial on the foregoing grounds, General Emergency and Dr. Pakiela once again cited Civ.R. 59(A)(1), (7), and (9). As noted, an abuse of discretion standard of review applies when this Court reviews a trial court's decision to deny a new trial under Civ.R. 59(A)(1). *See, e.g., Simon*, 2014-Ohio-1390, at ¶ 21-23; *Kallergis*, 2007-Ohio-6047, at ¶ 10. This Court also generally applies the abuse of discretion standard when reviewing a trial court's decision to include or exclude specific jury instructions. *Nist v. Mitchell*, 9th Dist.

Summit No. 27160, 2015-Ohio-4032, ¶ 27. An exception to the general rule exists when the issue is whether an instruction is a correct statement of law. *See AirBorn Electronics, Inc. v. Magnum Energy Solutions*, L.L.C., 9th Dist. Summit No. 28034, 2017-Ohio-70, ¶ 12. In those instances, a de novo standard of review applies. *Id.*

**{¶64}** "Requested [jury] instructions should be given if they correctly state the law as applied to the facts in the case and if reasonable minds might reach the conclusion sought by the instruction." *Nist* at ¶ 26. "A trial court's failure to give a proposed jury instruction is reversible error only if the party demonstrates not only that the trial court abused its discretion but also that it was prejudiced by the trial court's refusal to give the proposed instruction." *Valleaire Golf Club, Inc. v. Conrad*, 9th Dist. Medina No. 03CA0006-M, 2003-Ohio-6575, ¶ 8. "If there is no inherent prejudice in the inclusion of a particular jury instruction, prejudice must be affirmatively shown on the face of the record, and it cannot be presumed." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 35. "An unnecessary, ambiguous, or even affirmatively erroneous portion of a jury charge does not inevitably constitute reversible error." *Id.* "[A] reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.'" *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990).

Hindsight Instruction

**{¶65}** General Emergency and Dr. Pakiela asked the court to issue a hindsight instruction that reads as follows:

> In determining whether Dr. Pakiela was negligent, you are to consider his conduct in light of all the facts before him under the same or similar circumstances. You are not to evaluate his care based on after acquired information, but you may

consider his care based on the then known facts and the existing state of medical knowledge at the time the events were occurring.

They acknowledged that the instruction was not included in the Ohio Jury Instructions, but cited *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976) and several appellate court cases in support of their request for the instruction. The trial court ultimately refused to issue the instruction.

{¶66} The *Bruni* Court pronounced that, to prove a medical malpractice claim in instances of omission, a plaintiff must show that a physician omitted to do something that another physician would have done "under like or similar conditions or circumstances." *Bruni* at paragraph one of the syllabus. General Emergency and Dr. Pakiela argue that their proffered hindsight instruction was in accord with *Bruni's* "similar conditions or circumstances" language. *See, e.g., Miller v. Andrews*, 5th Dist. Richland No. 12CA44, 2013-Ohio-2490, ¶ 35-36. They argue that they were prejudiced by the court's refusal to give the instruction because Mr. McMichael's entire case hinged on the improper use of hindsight.

{¶67} Even assuming that the proffered hindsight instruction was a correct statement of law, the record does not support General Emergency and Dr. Pakiela's contention that they were prejudiced by its absence. *See Valleaire Golf Club, Inc.*, 2003-Ohio-6575, at ¶ 8. The trial court specifically instructed the jury that "[t]he existence of a physician-patient relationship places on the physician the duty to act as a physician of reasonable skill, care, and diligence * * * under like or similar conditions or circumstances." The court likewise instructed the jury that the standard of care for physicians who specialize in a practice is that of a "reasonable specialist practicing medicine exercising reasonable skill, care, and diligence under like and similar circumstances * * *." The court also issued a foreseeability instruction, instructing the jury that medical professionals (1) were only expected to be aware of harms that their peers "would foresee under similar circumstances," and (2) were not expected to guard against risks of harm

that their peers "would not foresee." Moreover, apart from the jury instructions themselves, General Emergency and Dr. Pakiela were able to draw attention to the concept of hindsight through several experts. Dr. MacQuarrie and Dr. Papa-Rugino both agreed on cross-examination that it would have been inappropriate for them to form their opinions on the basis of hindsight and that they had not done so. Further, the defense presented two experts, both of whom testified that Ms. McMichael's death was not foreseeable based on the information available to Dr. Pakiela on June 8th. Upon review, Emergency General and Dr. Pakiela have not shown that a hindsight instruction would have changed the result in this matter. Thus, this Court rejects their argument insofar as it concerns that instruction.

Life Expectancy Instruction

**{¶68}** Next, General Emergency and Dr. Pakiela take issue with the trial court's life expectancy instruction. The court instructed the jury as follows:

> Life Expectancy. [Ms.] McMichael was a 33-year-old African American female. The evidence of life expectancy of African American females 33 years of age is an estimate of the average remaining length of life of all persons in this country based on a limited number of persons of that age. It's an incomplete figure and does not indicate the future life span of any individual. Such evidence is not conclusive; however, it may be considered along with all the other evidence.

> The estimated average * * * remaining length of life of an African American female born on October 24, 1978, at 33 years of age on June 12th, is 47 years of an estimated age of death of 80 years.

> If you find for the plaintiff, you may consider what the probable normal length of [Ms.] McMichael's life would have been.

According to General Emergency and Dr. Pakiela, Ms. McMichael did not have a normal life expectancy due to her autoimmune disease, so it was error for the court to instruct the jury on the estimated average remaining life expectancy for a woman of her age.

**{¶69}** Even assuming that the court erred by instructing the jury on the average life expectancy of a woman Ms. McMichael's age, General Emergency and Dr. Pakiela have not

shown that they suffered resulting prejudice. *See Valleaire Golf Club, Inc.* at ¶ 8. First, the court's instruction, taken as a whole, specifically informed the jury that life expectancy evidence was not conclusive or indicative of the life span of any particular individual. *See Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993) (jury instructions must be reviewed as a whole). Second, Mr. McMichael's economy expert readily admitted that he was not testifying about Ms. McMichael's actual life expectancy. His present value estimates also were not contingent upon her living until the age of 80. Rather, his estimates included the calculations he made should Ms. McMichael only have lived for another ten, twenty, or thirty years. Third, the jury heard testimony that Ms. McMichael did not have a normal life span. Dr. Gershwin, the rheumatologist and expert on lupus, specifically testified that she likely would have died in her early 50s. Thus, upon review, this Court cannot conclude that General Emergency and Dr. Pakiela were prejudiced by the court's life expectancy instruction.

Insurance Instruction

**{¶70}** Finally, General Emergency and Dr. Pakiela argue that the trial court erred when it issued the jury instructions on insurance. The court instructed:

> In deciding damages, * * * you must not consider whether either party had insurance. Any assumption that either party had or did not have insurance is not relevant and may be wrong. You must not add or subtract from an award based on * * * any assumption regarding insurance. You must resolve all issues presented to you only on the evidence admitted and the law in these instructions.

The court gave the foregoing instruction twice; once when instructing on damages related to the survivorship claim and once when instructing on damages related to the wrongful death claim. General Emergency and Dr. Pakiela argue that the instruction was inappropriate because it suggested that they had insurance. They argue that its prejudicial effect "was then compounded

by the fact that the trial court read the instruction *twice*, thereby placing an over-emphasis on this issue." (Emphasis sic.)

**{¶71}** "Because courts realize that jurors will be tempted to inappropriately speculate regarding the impact of insurance, it is not improper to include an instruction for the jurors that there was no evidence taken on that issue, and therefore, they must not allow speculation about that issue to enter their discussions." *Davis v. Wooster Orthopaedics & Sports Med., Inc.*, 193 Ohio App.3d 581, 2011-Ohio-3199, ¶ 29 (9th Dist.). General Emergency and Dr. Pakiela attempt to distinguish *Davis* on the basis that, here, the court's insurance instruction came "just moments after a highly improper suggestion by Plaintiff's counsel at the end of their rebuttal closing argument that Defendants would have acted differently 'if it was their $10 million that they are now here defending.'" (Emphasis omitted.) They assert that the court's instruction reinforced the impression that they had insurance.

**{¶72}** "'[J]uries are presumed to follow the court's instructions * * *.'" *Price v. KNL Custom Homes, Inc.*, 9th Dist. Summit No. 26968, 2015-Ohio-436, ¶ 34, quoting *State v. Lowe*, 164 Ohio App.3d 726, 2005-Ohio-6614, ¶ 14 (10th Dist.). The court's instruction to the jury was specifically *not* to consider whether either party had insurance. General Emergency and Dr. Pakiela essentially invite this Court to speculate that, upon hearing the court's instruction not to consider insurance, the jury was somehow led to consider it. This Court declines to engage in such rampant speculation. Moreover, the fact that Mr. McMichael's counsel referenced a large sum of money in closing argument was, if anything, all the more reason for the court to caution the jury against speculating about insurance. *See* Discussion, *infra*. General Emergency and Dr. Pakiela's argument lacks merit.

**Improper and Prejudicial Remarks in Closing Argument**

{¶73} General Emergency and Dr. Pakiela next argue that they are entitled to a new trial due to improper and inflammatory comments that Mr. McMichael's counsel made during closing argument. They argue that counsel: (1) improperly suggested that they had $10 million available to them, but refused to take responsibility for Ms. McMichael's death; (2) improperly suggested that it was the jury's province to decide the applicable standard of care in the medical community; and (3) made several factual misrepresentations.

{¶74} In moving for a new trial on the foregoing grounds, General Emergency and Dr. Pakiela cited Civ.R. 59(A)(1), (2), (4), (7), and (9). They make no attempt to independently analyze any of the foregoing grounds on appeal. Instead, they simply argue that they were prejudiced by Mr. McMichael's counsel's alleged misconduct.

> "[C]ounsel should be afforded great latitude in closing argument, * * * and * * * the determination of whether the bounds of permissible argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court * * *. Therefore, the trial court's determination will not be reversed absent an abuse of discretion. However, [w]here gross and abusive conduct occurs, the trial court is bound, sua sponte, to correct the prejudicial effect of counsel's misconduct."

(Internal citations omitted.) *Riechers v. Biats*, 9th Dist. Summit No. 25248, 2010-Ohio-6448, ¶ 13, quoting *Pesek v. Univ. Neurologists Assn., Inc.*, 87 Ohio St.3d 495, 501 (2000). An abuse of discretion implies that a trial court was unreasonable, arbitrary or unconscionable in its judgment. *Blakemore*, 5 Ohio St.3d at 219.

<u>References to $10 Million and Defendants' Refusal to Take Responsibility</u>

{¶75} During rebuttal closing argument, Mr. McMichael's counsel argued that General Emergency and Dr. Pakiela would have been far more careful if, instead of caring for Ms. McMichael, they were caring for "their $10 million that they are now here defending * * *." The

court initially overruled an objection to counsel's statement, but counsel then attempted to expound on his point by stating: "If there was that $10 million in that room and Dr. Pakiela's job was to make sure it was safe before that money left the hospital * * *." At that point, defense counsel interrupted with a second objection, and the court sustained it.

{¶76} General Emergency and Dr. Pakiela argue that any reference to their financial status was highly prejudicial. They further argue that counsel's remarks, when paired with his accusations about their refusal to take responsibility, warranted a new trial. Yet, the court sustained their objection and, as a general rule, "[a]n appellant cannot predicate error on objections the trial court sustained." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 162. General Emergency and Dr. Pakiela attempt to circumvent that rule by arguing that the trial court only sustained their second objection, not their first. They argue that "the damage was already done" at that point, so the court's ruling did not cure the error. As previously noted, however, the trial court specifically instructed the jurors that they could not make any assumptions about insurance in deciding damages. Even if the jurors, upon hearing counsel's first remark, inferred that General Emergency and Dr. Pakiela possessed a sizeable amount of insurance, they were then told not to consider that fact in any damage award.

{¶77} This Court in no way condones counsel's remarks, and it would caution counsel against the inclusion of such remarks in future litigation. While attorneys are afforded great latitude in closing argument, the bounds of zealous advocacy are not endless and impassioned argument must not give way to inflammatory or fallacious argument. *See Riechers*, 2010-Ohio-6448, at ¶ 13, quoting *Pesek*, 87 Ohio St.3d at 501. Counsel's choice to make the foregoing remarks was ill advised, at best. Even so, the question is whether General Emergency and Dr. Pakiela have demonstrated prejudice as a result of those remarks. Under these particular facts

and circumstances, this Court cannot conclude that they have satisfied their burden. Because the trial court sustained their objection and because it specifically instructed the jury not to speculate as to the availability of insurance, General Emergency and Dr. Pakiela have not shown that they were prejudiced by counsel's remarks about the $10 million. *See* Civ.R. 61.

{¶78} General Emergency and Dr. Pakiela also fault Mr. McMichael's counsel for making disparaging remarks about their refusal to accept responsibility here. Their brief contains one citation to the record on this point. The citation relates to a single statement that Mr. McMichael's counsel made at the beginning of his closing argument. The statement was that one of the reasons Mr. McMichael was suing was because General Emergency and Dr. Pakiela had "refused to take responsibility."

{¶79} This Court cannot conclude that the foregoing statement amounts to a disparaging remark. As noted, counsel is "'afforded great latitude in closing argument.'" *Riechers* at ¶ 13, quoting *Pesek* at 501. The trial court reasonably could have concluded that the foregoing statement was within the bounds of permissible argument. Accordingly, this Court rejects General Emergency and Dr. Pakiela's argument to the contrary.

Standard of Care

{¶80} Next, General Emergency and Dr. Pakiela argue that they were deprived of a fair trial when Mr. McMichael's counsel ended his closing argument with the following remarks:

> When you get back in there, take your time. I know you have been anxious to probably start discussing the case. Make sure you talk about why you feel the way you do. You decide the standard of care in this community. You decide what's required in this community when a patient goes to the emergency room. Good luck. Thank you.

General Emergency and Dr. Pakiela did not object to counsel's remarks, but moved for a new trial on the basis that his remarks misrepresented the law. According to General Emergency and

Dr. Pakiela, the remarks suggested that the jurors could overlook the requirement for competent, expert testimony and decide the applicable standard of care based on their personal opinions.

**{¶81}** The record simply does not support General Emergency and Dr. Pakiela's reading of counsel's argument. Mr. McMichael's counsel never suggested to the jurors that they ought to disregard the expert testimony in this case. He simply impressed upon the jurors that they would be the ones to decide whether the standard of care had been met. Moreover, the trial court issued the jury detailed instructions on the applicable standard of care following closing argument. As previously noted, "'[j]uries are presumed to follow the court's instructions * * *.'". *Price*, 2015-Ohio-436, at ¶ 34, quoting *Lowe*, 2005-Ohio-6614, at ¶ 14. There is no evidence in the record that the jurors disregarded the court's instruction or decided the standard of care strictly on the basis of their personal opinions. Accordingly, General Emergency and Dr. Pakiela's argument lacks merit.

Factual Misrepresentations

**{¶82}** Next, General Emergency and Dr. Pakiela argue that they were denied a fair trial because Mr. McMichael's counsel made several factual misrepresentations during closing argument. They fault counsel for: (1) suggesting that they intentionally failed to secure the availability of their emergency medicine expert for another day of trial; (2) falsely telling the jury that no one had recommended an autopsy; and (3) misrepresenting to the judge and jury that a specific doctor from Akron General had made a statement about Ms. McMichael's cause of death. This Court addresses each issue in turn.

i. The Availability of the Defense Expert

**{¶83}** Dr. Kristopher Brickman testified for the defense as an emergency medicine expert. The defense called Dr. Brickman on a Friday afternoon. As the day's proceedings were

drawing to a close, Mr. McMichael's counsel was still conducting his cross-examination. The parties and the court then began having discussions at sidebar because the defense could not guarantee Dr. Brickman's availability after that day. The court informed the parties that the courthouse only remained open until 5:00 p.m., so it would not permit questioning to extend past that time. When that time expired, the court sent the jury home for the day, and the parties discussed the matter on the record. During that conversation, Mr. McMichael's counsel stated that he had additional questions for Dr. Brickman, but that he was "comfortable not insisting that he come back" if the doctor was no longer available for either party to ask additional questions.

{¶84} During closing argument, defense counsel discussed Dr. Brickman's testimony and specifically noted that Mr. McMichael's counsel had not even asked the doctor questions about the standard of care. Mr. McMichael's counsel then presented his rebuttal and reminded the jury that his cross-examination of Dr. Brickman had been cut short. He stated:

> Guess who didn't come back on Monday. So when [defense counsel] said: Oh, [Mr. McMichael's counsel] didn't ask [Dr. Brickman] about this, that, or the other; they didn't bring him back.

General Emergency and Dr. Pakiela argue that Mr. McMichael's counsel misled the jury because he made it appear as if it was their fault that Dr. Brickman did not return when, in fact, the parties had agreed that he would not return.

{¶85} General Emergency and Dr. Pakiela did not object to Mr. McMichael's counsel's statement at trial. Moreover, the record reflects that he made the statement in response to defense counsel's assertion that he had failed to ask Dr. Brickman any questions about the standard of care. Having reviewed the record, this Court concludes that the foregoing statement fell within the bounds of permissible argument. *Riechers*, 2010-Ohio-6448, at ¶ 13, quoting

*Pesek*, 87 Ohio St.2d at 501. Accordingly, General Emergency and Dr. Pakiela's argument to the contrary lacks merit.

### ii. The Autopsy

**{¶86}** Next, General Emergency and Dr. Pakiela argue that Mr. McMichael's counsel falsely told the jury that there was no evidence anyone had recommended an autopsy for Ms. McMichael. They note that Mr. McMichael specifically testified that Akron General had suggested he have an autopsy done. As such, they argue that counsel's statement misled the jury.

**{¶87}** Mr. McMichael's counsel's exact statement to the jury was: "There is no evidence *in here* that anyone recommended an autopsy." (Emphasis added.) Around the time he made that statement, he had been referring to Ms. McMichael's chart and her various medical records. Without additional information, this Court cannot determine what counsel meant when he stated that there was no evidence of an autopsy recommendation "in here." If counsel was gesturing to a specific medical record when he made that statement, his statement may have been accurate and, therefore, not misleading. The record simply does not contain enough information for this Court to make a determination. Because the burden of demonstrating error rests on General Emergency and Dr. Pakiela, this Court must conclude that they failed to satisfy their burden. *See Rosen v. Lax*, 9th Dist. Summit No. 27367, 2016-Ohio-182, ¶ 22.

### iii. The Cause of Death Statement

**{¶88}** Next, General Emergency and Dr. Pakiela argue that they were denied a fair trial when Mr. McMichael's counsel elicited certain testimony from Mr. McMichael on direct examination. Counsel asked Mr. McMichael to tell the jury what a specific doctor at Akron General had told him about the cause of his wife's death. Mr. McMichael then stated that he was

told that swelling in his wife's brain had "caused a portion of [her brain] to just go down and that pretty much caused her to be brain dead." On cross-examination, Mr. McMichael acknowledged that he could not recall the name of the doctor with whom he had spoken. Because he could not recall the doctor's name, General Emergency and Dr. Pakiela argue that the doctor's purported statement was inadmissible hearsay. They argue that the trial court only admitted the statement because Mr. McMichael's counsel falsely attributed it to a specific doctor.

{¶89} Even assuming that Mr. McMichael's counsel ought not to have attributed the foregoing statement to a specific doctor before confirming that Mr. McMichael could remember the doctor's identity, General Emergency and Dr. Pakiela have not established prejudice as a result of the admission of the statement. At best, the testimony was cumulative. Mr. McMichael presented expert testimony on the issue of proximate cause, and Ms. McMichael's death certificate listed her cause of death as "tonsillar herniation of [the] cerebellum" due to "diffuse cerebral edema." Thus, General Emergency and Dr. Pakiela have not shown that the admission of the foregoing testimony affected their substantial rights. *See* Civ.R. 61.

**Cumulative Error**

{¶90} Lastly, General Emergency and Dr. Pakiela argue that the cumulative effect of all of the foregoing errors deprived them of a fair trial.

> Under the cumulative error doctrine, a judgment may be reversed if the cumulative effect of multiple errors deprives a party of his constitutional rights even though, individually, the errors may not rise to the level of prejudicial error or cause for reversal. However, "the cumulative error doctrine is not typically employed in civil cases."

(Internal citation omitted.) *J.P. v. T.H.*, 9th Dist. Lorain No. 14CA010715, 2016-Ohio-243, ¶ 35, quoting *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 124. Moreover, General Emergency and Dr. Pakiela did not raise cumulative error as an

argument in support of their motion for a new trial. Even assuming the civil nature of this case would not have foreclosed a cumulative error argument, this Court will not address new arguments for the first time on appeal. *JPMorgan Chase Bank, Natl. Assn. v. Burden*, 9th Dist. Summit No. 27104, 2014-Ohio-2746, ¶ 12. This Court, therefore, rejects General Emergency and Dr. Pakiela's attempt to raise cumulative error for the first time on appeal. Their second assignment of error is overruled.

III.

**{¶91}** General Emergency and Dr. Pakiela's assignments of error are overruled, and Mr. McMichael's cross-appeal is dismissed. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

LYNNE S. CALLAHAN
FOR THE COURT

CARR, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

STEPHEN W. FUNK and LEIGHANN K. FINK, Attorneys at Law, for Appellant.

ANNA MOORE CARULAS and JOSEPH E. HERBERT, Attorneys at Law, for Appellee.