[Cite as *Patterson v. Omni Orthopaedics, Inc.*, 2023-Ohio-3416.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| MICHAEL L. PATTERSON | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellant | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | Case No. 2022CA00158 |
| | : | |
| OMNI ORTHOPAEDICS, INC. | : | |
| | : | |
| | : | |
| Defendant-Appellee | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of
Common Pleas, Case No.
2021CV00718

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      September 25, 2023

APPEARANCES:

For Plaintiff-Appellant:

R. CRAIG MCLAUGHLIN
6105 Parkland Blvd., Suite 200
Mayfield Heights, OH 44124

For Defendants-Appellees:

W. BRADFORD LONGBRAKE
3737 Embassy Parkway, Suite 100
Akron, OH 44333

*Delaney, P.J.*

{¶1} Plaintiff-Appellant Michael L. Patterson appeals the November 10, 2022 judgment entry of the Stark County Court of Common Pleas.

**FACTS AND PROCEDURAL HISTORY**

**Hip Replacement Surgery**

{¶2} On May 29, 2020, Defendant-Appellee Matthew Stonestreet M.D. performed a left total hip arthroplasty surgery on Plaintiff-Appellant Michael Patterson. Before the surgery, Patterson claimed he had normal function in his left knee with no significant issues with weakness or numbness. After the surgery, Patterson claimed he had no active knee extension, decreased light touch sensation in his left leg, and numbness. Nerve studies were completed and showed that Patterson suffered a femoral nerve injury during the surgery.

**Medical Negligence Action**

{¶3} Patterson filed a complaint in the Stark County Court of Common Pleas against Defendants-Appellees Omni Orthopaedics, Inc.; Orthopaedic Multispecialty Network, Inc.; and Matthew Stonestreet, M.D. (hereinafter "Omni") for medical negligence. Patterson alleged that on May 29, 2020, Dr. Stonestreet breached the duty of care he owed by negligently performing the surgery, thereby causing Patterson permanent injury. In support of his complaint, Patterson produced an expert report from John Lombardi, M.D. The expert report stated, in pertinent part:

ANALYSIS

* * * Nerve injury is a possible complication of this procedure, but that is the

reason important maneuvers are employed during the surgery to avoid

damage to the nerve. Based on my education, training, and experience, in my opinion, permanent damage to the femoral nerve does not happen unless the surgeon does something wrong. In my opinion, more likely than not, the permanent damage to Michael Patterson's femoral nerve happened because Dr. Stonestreet negligently compressed the nerve with the placement of the retractors he used during the surgery and/or by leaning on the retractors and compressing the femoral nerve during surgery.

SUMMARY OF MY EXPERT OPINIONS

* * *

1. In my opinion, Dr. Stonestreet breached the standard of care on May 29, 2020 when he performed the total left hip replacement surgery on Michael Patterson. Specifically, Dr. Stonestreet breached the standard of care by permanently injuring Michael Patterson's femoral nerve and injuring it during the surgery. A permanent femoral nerve injury does not happen absent medical negligence.

2. In my opinion, Dr. Stonestreet's breach of the standard of care caused Michael Patterson's injuries and damages, including permanently injuring his left femoral nerve.

**Summary Judgment**

{¶4} On July 26, 2022, Omni filed a motion for summary judgment arguing that Patterson could not establish Omni fell below the standard of care and the breach was the cause of Patterson's injury. Omni relied on Dr. Lombardi's expert report and

deposition, arguing that Dr. Lombardi could not identify anything that Dr. Stonestreet did or failed to do that was not within the standard of care.

{¶5} In support of Omni's motion for summary judgment, Omni presented the May 16, 2022 deposition of Dr. Lombardi. Dr. Lombardi agreed that an orthopaedic surgeon was unable to guarantee that a patient will not have a femoral nerve injury as the result of an anterior total hip replacement. He stated it was on the list of possible complications of the procedure, and "it's there because there is a possible risk of having temporary or permanent injury to the nerve." (Lombardi Depo. pp. 26-27). Omni then asked Dr. Lombardi the following questions relevant to the present appeal:

Q. Is it your belief that a femoral nerve injury following an anterior total hip replacement procedure can only be the result of surgeon negligence?

A. Define injury.

Q. I'm referring to the last page of your report, and you say: A permanent femoral nerve injury does not happen absent medical negligence. * * *

A. Yes. You said injury. I didn't know if you were referring to temporary, or transient, versus permanent.

Q. Okay. So is it your opinion that a transient femoral nerve injury can happen without medical negligence but a permanent has to have medical negligence?

A. My opinion there is that the permanent nerve injury I do not believe is something I would expect myself or any of my colleagues under the same circumstances to be okay to happen to a patient. That's why this opinion is here. It's not that that it can't happen. It's not saying that I think that this

particular doctor did this purposefully. But if the injury occurs or if there's a transient injury, it in my opinion is much more consistent with joint manipulation, temporary stretch, temporary retractor placement, all these things, spine related.

A temporary is more common and – or I should say it's more common, that this type of thing resolves spontaneously for those reasons. The permanency is why I think this cannot be considered standard.

Q. Well, is the standard the outcome or is the standard the technique that was used?

A. The technique dictates the outcome.

Q. Okay. So what is it about the technique that occurred here that made it a permanent femoral nerve injury and, therefore, medical negligence as opposed to a transient femoral nerve injury that you believe is not medical negligence?

A. That is guessing and speculating. I mean, you can go through the reasons that this can happen, and we all pay attention to not make it happen. But this is a permanent injury, and I just can't consider that a standard that that's acceptable.

Q. A standard in terms of –

A. The standard of care.

Q. Okay. Well, let's back up. An outcome isn't the standard of care. True?

A. That's part of it. I don't know where you're going with this, so I don't want to say yes or no and then box myself into something that I don't believe.

* * *

Q. So ignoring the outcome, what act or omission did Dr. Stonestreet do or not do that was below the standard of care?

A. Again, this comes from – you can't look at this without the outcome because we don't have a video or anything objectively documenting the point of injury. It's – it's – and that's been defined here, and I agree with that, we can't say that at this point that retractor was on there and, boom, that's when the injury was without the monitoring you were talking about. But the proximity or the timing of having a nerve that was functional and then not functioning immediately postop with this approach is how I define what was done or how it was done in surgery as something that happened with the retractor most commonly and obviously based on what has occurred that cannot be considered the standard of care.

Q. Okay. So tell me what occurred that caused a permanent femoral nerve injury in this case.

A. Well, again, I have to describe what can do it because obviously I don't have – I don't have the evidence of showing the video of this retractor at or against the nerve. But in this approach, being sure that you're down on the anterior wall or superior wall of the acetabulum is critical to avoid the nerve that is in close proximity to the femoral nerve. If you go too deep, you can contact the nerve. If you go too deep and retract, like you need to visual the acetabulum, you can cause injury to the nerve at that level.

Q. Can we agree that you never visualize the nerve during this procedure?

A. Yes, I agree with that.

Q. The nerve is encased in other tissues?

A. Correct.

Q. Is there a permanent femoral nerve injury every time that the retractor compresses the nerve?

A. I would say no.

* * *

Q. Okay. So how does a surgeon know that the nerve is being compressed?

A. You don't.

Q. Okay.

A. The only way you know is by careful placement of the retractor, and that's what this all comes back to, and what we think about every time we go in there and put the retractor in the acetabulum.

Q. But even though you place it carefully, you haven't visualized the nerve and you don't know if you're compressing it or not. Fair?

A. Fair that you don't visualize the nerve. By placement on the acetabular wall, that is why you know you're not compressing the nerve directly.

Q. So it's your opinion that a surgeon can definitively determine they are not compressing the nerve based on the location of the retractor on the acetabular wall?

A. That's what you have to go by.

Q. And you have to go by that because you don't know?

A. Because you don't see the nerve, yes.

Q. * * * How long does the femoral nerve have to be compressed for it to progress from transient to permanent injury?

A. I don't know.

Q. Can it differ from patient to patient?

A. I would think so, going back to our risks involved.

* * *

Q. What portion of the nerve was compressed?

* * *

A. Right. It's hard to say. You have to take what functionally was lacking and basically track that back to what it would be as far as what part of the femoral nerve and what it serves.

* * *

Q. Is it your belief that in all cases where the patient failed to recover from that femoral nerve palsy that the performing surgeon committed medical malpractice?

A. That's hard to answer.

Q. Why is that hard to answer?

A. My opinion on this case is based on, again, the patient, the nerve injury, the approach, the timing of the injury immediately following surgery.

* * *

Q. Okay. So backing up to our discussion of this percentage of people who have a femoral nerve palsy following surgery that is permanent and they don't recover, hence permanent I guess, are you telling us that all of the

surgeons who perform those surgeries that resulted in that outcome, the same outcome we have in this case, committed medical negligence?

* * *

A. I don't know how to answer that.

Q. Could some of those injuries have resulted or occurred absent physician negligence, permanent femoral nerve injuries following an anterior approach to a total hip replacement?

* * *

A. I don't know how to answer that.

Q. Well, I guess do you stand by the statement on page three, opinion one: A permanent femoral nerve injury does not happen absent medical negligence?

* * *

A. In considering this case, I stand by what I said there. * * * I'm just saying I'm addressing this patient and this case in my opinion.

Q. What is it about this surgery that constitutes medical negligence other than there's a permanent femoral nerve injury which you believe doesn't happen in this case absent medical negligence?

A. I've already stated that I believe that the level of the injury is associated with a problem with the retractor placement, pressure on the nerve, or both in this case. And that's why I – you can say what I – the wording in there as far as absent negligence or you can say I just don't agree that that is

consistent with the standard of care to have the permanent nerve injury from this occurring.

Q. Okay. Where did he place the retractors that was below the standard of care?

A. I can't answer that. I don't have a video of the process.

Q. Okay.

A. We talked about earlier the location of the retractors in relation to that nerve is what is the high risk, makes that a high risk if the retractor is placed too close or on the nerve to cause this problem.

Q. And what landmarks are there that you're to avoid to ensure that that doesn't occur?

A. There's a higher risk in certain areas of the acetabulum, even if you go on bone. But as I said earlier, you go straight onto bone, you do that every time, you're away from the nerve.

Q. Where did Dr. Stonestreet testify that the retractors were placed?

A. I don't recall.

Q. If he placed the retractors on the bone and there was still a permanent femoral nerve injury, was he negligent? Did he breach the standard of care?

* * *

A. I don't know how to answer that.

Q. Okay.

A. The placement in that – on bone should be the safe zone and prevent this injury. I can say that.

Q. Okay. Is it a guarantee that the injury doesn't occur if it's placed on the bone?

A. I can't say that that is a guarantee, no.

Q. Okay. The compression to the nerve, does that result in mechanical trauma to the nerve, ischemia to the nerve, or a combination?

A. Any of the above.

Q. Do we know what happened in this case?

A. No.

Q. Can the compression be, rather than contact with the retractor, the degree of compression amongst the soft tissues where the nerve is running?

A. It could. * * * I would say indirect tension through via the retractor could happen.

* * *

Q. I want to return to literature a little bit. Is there any medical literature that you found or can refer me to that indicates that permanent femoral nerve injury following a total hip – an anterior total hip replacement can only occur with physician negligence?

A. No.

Q. Any statements by the American Academy of Orthopaedic Surgeons that warns or advises its members or fellow that if they have that complication they've committed medical negligence?

A. No.

Q. Have they made a statement contrary to that, that it can occur in the presence of a physician performing a surgery within the standard of care?

A. Not that I know of.

Q. How about the American Board of Orthopaedic Surgery, same question?

A. No.

(Lombardi Depo. pp. 29-49; 59-60).

{¶6} Patterson responded to the motion for summary judgment. In his response, Patterson acknowledged that Dr. Lombardi conceded he did not exactly know when the injury occurred during the surgery. However, Dr. Lombardi testified it was his opinion within a reasonable degree of medical certainty that the injury occurred during surgery and the injury occurred by either improper placement of the retractor or excessive force on the retractor.

{¶7} On November 10, 2022, the trial court granted Omni's motion for summary judgment. Utilizing the standard established in *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), the trial court found Patterson's expert testimony did not create a genuine issue of material fact that Omni fell below the standard of care and the breach was the cause of the permanent femoral nerve injury. The trial court found that Dr. Lombardi was unable to identify any specific act of Dr. Stonestreet that fell below the standard of care. Dr. Lombardi's deposition testimony demonstrated his opinion that Omni fell below the standard of care was based on speculation. The trial court further found that Dr. Lombardi's opinion was based on the fact that Patterson suffered a permanent femoral nerve injury, which Dr. Lombardi acknowledged was a known risk of the surgery and could happen without medical negligence. Dr. Lombardi's deposition testimony that

a permanent femoral nerve injury can occur absent medical negligence contradicted his expert report, which stated that a permanent femoral nerve injury does not happen absent medical negligence. Because Patterson's expert was unable to offer an opinion with the requisite degree of medical certainty as to an act or omission on the part of Omni which constitutes a breach of the standard of care, the trial court found Patterson's claim of medical negligence failed as a matter of law.

{¶8} It is from this November 10, 2022 judgment entry that Patterson now appeals.

## ASSIGNMENT OF ERROR

{¶9} Patterson raises one Assignment of Error:

"THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEES."

## ANALYSIS

### Standard of Review

{¶10} Patterson's sole Assignment of Error contends the trial court erred when it granted summary judgment in favor of Omni. Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 36, 506 N.E.2d 212 (1987). As such, this Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

{¶11} Civ.R. 56 provides summary judgment may be granted only after the trial court determines: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the

evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977).

{¶12} It is well established that the party seeking summary judgment bears the burden of demonstrating no issues of material fact exist for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment is delineated in *Dresher v. Burt*, 75 Ohio St.3d 280 at 293, 662 N.E.2d 264 (1996): "* * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed

in the light most favorable to the opposing party. *Williams v. First United Church of Christ*, 37 Ohio St.2d 150, 309 N.E.2d 924 (1974).

## Medical Negligence

{¶13} It is well settled that, "in order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673, 675 (1976), paragraph one of syllabus. Summarized, a prima facie case of medical malpractice consists of a showing that: (1) the physician deviated from the ordinary standard of care exercised by other physicians, i.e. the physician was negligent, and (2) such deviation was the proximate cause of the patient's injury. *Heard v. Aultman Hosp.*, 5th Dist. Stark No. 2015CA00141, 2016-Ohio-1076, ¶ 30 citing *Egleston v. Fell*, 6th Dist. Lucas No. L–95–127, 1996 WL 50161, *2 (Feb. 9, 1996) citing *Bruni*, 46 Ohio St.2d 127, 346 N.E.2d 673, paragraph one of syllabus.

{¶14} In order to prevail in a medical malpractice claim, a plaintiff must demonstrate through expert testimony that, among other things, the treatment provided did not meet the prevailing standard of care and the failure to meet the standard of care caused the patient's injury. *Heard*, 2016-Ohio-1076, ¶ 31 citing *Ramage v. Central Ohio Emergency Services, Inc.*, 64 Ohio St.3d 97, 102, 1992–Ohio–109, 592 N.E.2d 828;

*Hoffman v. Davidson*, 31 Ohio St.3d 60, 62, 508 N.E.2d 958 (1987). A plaintiff must prove, through medical expert testimony, that his or her injury "'was, more likely than not, caused by the defendant's negligence.'" *McMichael v. Akron Gen. Med. Ctr.*, 2017-Ohio-7594, 97 N.E.3d 756, ¶ 11 (9th Dist.) quoting *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, 915 N.E.2d 361, ¶ 11 (9th Dist.), quoting *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St.3d 483, 485, 668 N.E.2d 480 (1996). Proof of the recognized standards must necessarily be provided through expert testimony. This expert must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place, according to the body of law that has developed in this area of evidence. *Bruni* at 131–132, 346 N.E.2d 673.

{¶15} In their motion for summary judgment, Omni contended that Patterson's medical expert witness, Dr. Lombardi, could not identify anything that Dr. Stonestreet did or failed to do in his treatment that was not within the standard of care. The trial court reviewed Dr. Lombardi's deposition and expert report to find that his expert testimony was insufficient to create a genuine issue of material fact that Patterson's injury was, more likely than not, caused by Omni's negligence. The trial court cited the specific portions of Dr. Lombardi's deposition testimony where Dr. Lombardi was unable to identify any specific act by Dr. Stonestreet that fell below the standard of care. The trial court noted Dr. Lombardi's expert opinion that Dr. Stonestreet fell below the standard of care was based solely on the outcome of the surgery where Patterson suffered a permanent, rather than transient, femoral nerve injury. The trial court cited the following excerpts of the deposition in support of its judgment:

Q. Okay. So what is it about the technique that occurred here that made it a permanent femoral nerve injury and, therefore, medical negligence as opposed to a transient femoral nerve injury that you believe is not medical negligence?

A. That is guessing and speculating. I mean, you can go through the reasons that this can happen, and we all pay attention to not make it happen. But this is a permanent injury, and I just can't consider that a standard that that's acceptable.

* * *

Q. So ignoring the outcome, what act or omission did Dr. Stonestreet do or not do that was below the standard of care?

A. Again, this comes from – you can't look at this without the outcome because we don't have a video or anything objectively documenting the point of injury. It's – it's – and that's been defined here, and I agree with that, we can't say that at this point that retractor was on there and, boom, that's when the injury was without the monitoring you were talking about. But the proximity or the timing of having a nerve that was functional and then not functioning immediately postop with this approach is how I define what was done or how it was done in surgery as something that happened with the retractor most commonly and obviously based on what has occurred that cannot be considered the standard of care.

Q. Okay. So tell me what occurred that caused a permanent femoral nerve injury in this case.

A. Well, again, I have to describe what can do it because obviously I don't have – I don't have the evidence of showing the video of this retractor at or against the nerve. But in this approach, being sure that you're down on the anterior wall or superior wall of the acetabulum is critical to avoid the nerve that is in close proximity to the femoral nerve. If you go too deep, you can contact the nerve. If you go too deep and retract, like you need to visual the acetabulum, you can cause injury to the nerve at that level.

Q. Can we agree that you never visualize the nerve during this procedure?

A. Yes, I agree with that.

Q. The nerve is encased in other tissues?

A. Correct.

Q. Is there a permanent femoral nerve injury every time that the retractor compresses the nerve?

A. I would say no.

(Lombardi Depo. pp. 31-34).

{¶16} The trial court further noted that Dr. Lombardi testified a transient femoral nerve injury is more common during an anterior hip replacement, but a permanent femoral nerve injury is a known risk of an anterior hip replacement and can occur without medical negligence:

Q. Is it your belief that a femoral nerve injury following an anterior total hip replacement procedure can only be the result of surgeon negligence?

A. Define injury.

Q. I'm referring to the last page of your report, and you say: A permanent femoral nerve injury does not happen absent medical negligence. * * *

A. Yes. You said injury. I didn't know if you were referring to temporary, or transient, versus permanent.

Q. Okay. So is it your opinion that a transient femoral nerve injury can happen without medical negligence but a permanent has to have medical negligence?

A. My opinion there is that the permanent nerve injury I do not believe is something I would expect myself or any of my colleagues under the same circumstances to be okay to happen to a patient. That's why this opinion is here. It's not that that it can't happen. It's not saying that I think that this particular doctor did this purposefully. But if the injury occurs or if there's a transient injury, it in my opinion is much more consistent with joint manipulation, temporary stretch, temporary retractor placement, all these things, spine related.

A temporary is more common and – or I should say it's more common, that this type of thing resolves spontaneously for those reasons. The permanency is why I think this cannot be considered standard.

(Lombardi Depo., pp. 29-31).

{¶17} In his response to the motion for summary judgment and in his appeal, Patterson argues that while Dr. Lombardi conceded he did not know at what point during the surgery that Patterson's injury occurred, Dr. Lombardi held to his opinion to a reasonable degree of the medical certainty that the injury occurred during surgery and

occurred one of two ways, either by improper placement of the retractor and/or excessive force on the retractor. Patterson cites the trial court and this Court to the facts of *O'Connor v. Fairview Hosp.*, 8th Dist. Cuyahoga No. 98721, 2013-Ohio-1794, where the plaintiff suffered a brachial plexus injury after undergoing open heart surgery. The plaintiff's expert was of the opinion that the plaintiff's injury was the result of undue external pressure applied to the plaintiff's upper extremity during the surgery. *Id.* at ¶ 12. "The pressure, he opined, occurred through one of two mechanisms, or a combination of both. The first possible mechanism of the undue pressure was from inadequate or improper padding around O'Connor's right arm during the surgery. The second possible mechanism of the undue pressure was from someone leaning against O'Connor's right upper extremity during the surgery. Dr. Weingarten was of the opinion that either of these mechanisms fell below the standard of care." *Id.* at ¶ 12. The hospital presented expert testimony that the injury occurred internally and was a known complication of open heart surgery. *Id.* at ¶ 13.

{¶18} The Eighth District Court of Appeals stated that "the establishment of proximate cause through 'medical expert testimony must be by probability. At a minimum, the trier of fact must be provided with evidence that the injury was more likely than not caused by defendant's negligence. *See Cooper v. Sisters of Charity*, 27 Ohio St.2d [242,] 252, [272 N.E.2d 97 (1971)]. Opinions expressed with a lesser degree of certainty must be excluded as speculative. (Footnote omitted.)'" *Vactor v. Franklin Blvd. Nursing Home*, Inc., 8th Dist. Cuyahoga No. 109708, 2021-Ohio-945, 2021 WL 1146319, ¶ 28 quoting *O'Connor v. Fairview Hosp.*, 8th Dist. Cuyahoga No. 98721, 2013-Ohio-1794, ¶ 27,

quoting *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 369, 504 N.E.2d 44 (1986).

{¶19} After a plaintiff's jury verdict, the defendant hospital in *O'Connor* argued on appeal that plaintiff's expert impermissibly offered alternative theories of causation without expressing an opinion as to the requisite degree of probability that one of the theories was a causative factor of the injury. *O'Connor*, 2013-Ohio-1794 at ¶ 28. The Eighth District disagreed:

> Here, Dr. Weingarten did not testify as to an alternative theory of the cause of O'Connor's injury. Rather, he testified he was of the opinion the injury was caused by external pressure that was applied to O'Connor's right hand and wrist area during the surgery. He testified that his opinion was to a reasonable degree of medical certainty and that the application of such pressure fell below the standard of care.
>
> Because Dr. Weingarten was obviously not present during the surgery, he opined that there were two ways in which the pressure could have been applied: improper padding or improper leaning. But in any event, however the pressure was applied, Dr. Weingarten testified, to a reasonable degree of medical certainty, that it was applied externally, that such an exertion of pressure was below the standard of care, and that it was the proximate cause of O'Connor's injury.

*O'Connor*, 2013-Ohio-1794, ¶¶ 40-41.

{¶20} In this case, Omni does not dispute the injury to the femoral nerve occurred during surgery. Dr. Lombardi's expert report states, "In my opinion, more likely than not,

the permanent damage to Michael Patterson's femoral nerve happened because Dr. Stonestreet negligently compressed the nerve with the placement of the retractors he used during the surgery and/or by leaning on the retractors and compressing the femoral nerve during surgery." Patterson contends this statement is sufficient to meet the threshold set in *O'Connor* and create a genuine issue of material fact that Dr. Stonestreet's actions fell below the standard of care and proximately caused Patterson's injury.

{¶21} In contrast to his expert report, Dr. Lombardi could not specify to a reasonable degree of medical certainty in his deposition that Patterson's injury occurred because the two possible mechanisms, which he identified in his expert report, fell below the standard of care. Dr. Lombardi identified how a permanent femoral nerve injury could occur. He agreed the injury was a known complication that could occur without medical negligence. He could not recall Dr. Stonestreet's testimony as to where the retractors were placed during surgery. He could not identify any medical literature to support his conclusion that a permanent femoral nerve injury only occurred because of physician negligence. Dr. Lombardi relied on the bad outcome of the case to speculate as to the manner in which Dr. Stonestreet breached the standard of care. However, as the trial court noted, it is "a fundamental precept of tort law that the mere occurrence of an injury or accident, in and of itself, does not mean that the injury was the result of negligence. *Laughlin v. Cleveland,* 168 Ohio St. 576, 577, 156 N.E.2d 827 (1959), paragraph two of the syllabus." *Daniels v. Northcoast Anesthesia Providers, Inc.*, 2018-Ohio-3562, 120 N.E.3d 52, ¶ 46 (8th Dist.).

{¶22} In this case, we cannot say the trial court erred in granting summary judgment in favor of Omni. Our de novo review of the Civ.R. 56 evidence supports the trial court's conclusion that Dr. Lombardi was unable to offer an opinion with the requisite degree of medical certainty as to an act or omission on the part of Omni which constitutes a breach of the standard of care.

{¶23} Patterson's sole Assignment of Error is overruled.

## CONCLUSION

{¶24} The judgment of the Stark County Court of Common Pleas is affirmed.

By: Delaney, P.J.,

Baldwin, J. and

King, J., concur.